**Opal Hicks YEARY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 89–CV–73547–DT.

United States District Court, E.D. Michigan, S.D.

Jan. 8, 1991.

L. Eugene Hunt, Jr., Dearborn, Mich., for plaintiff.

William L. Woodward, U.S. Atty.'s Office, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This action against the United States was filed pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346 and 2671–2680. It arises from a traffic accident involving the plaintiff, a pedestrian, and a vehicle operated by an employee of the United States Postal Service. The employee, a letter carrier, was at all times acting within the scope of his employment. This opinion constitutes the findings of fact and conclusions of law of the court, after trial to the bench.

Plaintiff seeks damages for serious impairment of bodily function and permanent serious disfigurement under Michigan's No-Fault Automobile Insurance Act, M.C.L.A. § 500.3135. She was a woman of sixty-eight (68) years of age at the time of the accident, and seeks damages for a fractured dominant left wrist, fractured left ankle, and for current back pain allegedly caused by the accident. In addition, plaintiff seeks to recover for aggravation of a carpal tunnel syndrome condition in the left wrist. There is no claim for lost income or other economic damages.

On Saturday, June 11, 1988, plaintiff attempted to cross a major thoroughfare, Nine Mile Road in the city of Hazel Park, on her way home from Smiley's Hair Care Salon, at approximately 10:00 a.m. Although it was plaintiff's usual practice to cross Nine Mile Road at this point after her Saturday morning appointments, the corner was not a designated pedestrian crosswalk. Plaintiff mistakenly believed that the traffic stop bar painted across the westbound lanes of Nine Mile Road at Carlisle constituted a pedestrian crosswalk, although it was in fact merely an indication that cars

stopped for a light in the next block must not block the side street, Carlisle.

The postal driver had just left the Post Office and was in the process of emerging from Carlisle onto Nine Mile to commence his route at the time of the accident. He was driving a red 1987 Chevrolet Chevette which was owned by the United States Postal Service. He drove southbound from the Post Office lot on Carlisle Street and stopped at the intersection at Nine Mile Road, which had no traffic lights. Traffic on Nine Mile Road is heavy, as it is a five lane business thoroughfare. It was his intention to make a left turn onto Nine Mile Road and to proceed eastward. As the driver was attempting to make the turn and watching oncoming cars, plaintiff walked south from the northeast Carlisle corner, halfway across the street and stepped into his path. He immediately braked his automobile in an effort to avoid colliding with her. However, he could not then avoid striking plaintiff, and did so with the side of the left front fender of his automobile. Plaintiff did not see the postal vehicle emerge from Carlisle behind her as she crossed the street until the moment just before impact, when it turned in front of her and she hit the left front fender. At the time of the collision, plaintiff fell forward onto the side of the fender, and then fell backward onto the pavement, landing on her left side. The postman stopped the vehicle immediately next to the plaintiff in an eastbound lane of Nine Mile Road. A passing bus driver immediately summoned the police and the Emergency Medical Service (EMS).

## I. JURISDICTION

■ The Federal Tort Claims Act constitutes a limited waiver of sovereign immunity and authorizes suit against the United States, making the federal government liable in the same manner and to the same extent as a private party would be for certain torts of federal employees acting within the scope of their employment. *Schindler v. United States of America,* 661 F.2d 552, 554 n. 2 (6th Cir.1981).

■ The United States District Courts have exclusive jurisdiction of civil actions on claims against the United States for money damages caused by the negligent or wrongful act of any employee of the Government while acting within the scope of employment. 28 U.S.C. § 1346(b).

■ In such cases, the Courts must follow the law of the state in which the allegedly negligent or wrongful act occurred. *Schindler,* supra, involved a claim under the FTCA for negligent licensing. 661 F.2d at 552. In applying the FTCA, the Court set forth the elements of a cause of action for tortious injury under Michigan law. The Court stated,

"In applying the FTCA, the court must use state law pertaining to private persons ... to determine if these elements are present." *Id.* at 560.

## II. COMPARATIVE NEGLIGENCE

■ Michigan has adopted the doctrine of pure comparative negligence. *Placek v. Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511 (1979). A plaintiff's recovery of damages for negligence must be reduced to the degree of the plaintiff's own negligent contribution to the injury. *Id.* at 405 Mich. 639, 275 N.W.2d 511.

■ It is well-settled case law that a pedestrian, before crossing a street or highway, must exercise that degree of care and caution which an ordinarily careful and prudent person would exercise under like circumstances. *Malone v. Vining,* 313 Mich. 315, 21 N.W.2d 144 (1946).

Although a defendant is guilty of negligence, "this does not absolve the pedestrian from looking while crossing the street, which is what any ordinarily prudent person should do when crossing the street at a busy intersection. Maintaining one's right-of-way in the face of obvious danger ... may ultimately result in disaster." *Day v. Troyer,* 341 Mich. 189, 197, 67 N.W.2d 74 (Mich.1954).

The above-quoted case is, notably, one in which the comparatively negligent plaintiff had the right-of-way. In this case, the government admits the negligence of its

**550**

driver. The court finds, however, that plaintiff was also clearly negligent under the circumstances, for each of the reasons outlined below.

### A. Illegal Crossing

■ It was illegal for plaintiff to cross Nine Mile Road at the Carlisle Street intersection. The City of Hazel Park has adopted, by ordinance, the State of Michigan's Uniform Traffic Code. Section 7.10 of that code prohibits pedestrians from crossing a business street other than in a crosswalk. Since plaintiff attempted to cross Nine Mile Road (a statutory business street, because of the commercial establishments on it) where there was no crosswalk, she was in violation of the ordinance.

■ In Michigan, a violation of an ordinance is evidence of negligence. *Hodgdon v. Barr*, 334 Mich. 60, 53 N.W.2d 844 (1952); *Stinson v. Payne*, 231 Mich. 158, 203 N.W. 831 (1925). As such, plaintiff is negligent for violating a regulation promulgated under a state statute.

### B. Failure to Recognize Stop Bar

■ Plaintiff was negligent in believing that the "stop bar" across the westbound lanes of Nine Mile Road designated that area as a pedestrian crosswalk. There is no sign indicating that pedestrian crossing is allowed in the section where plaintiff crossed, and indeed it is not. Plaintiff has been a licensed Michigan driver for many years. Her failure to recognize the white line as a stop bar instead of a crosswalk is evidence of negligence.

### C. Sidewalk Configuration

■ There is a grassy berm on each side of Nine Mile Road between the curb and the sidewalk, suggesting clearly that no pedestrian access to Nine Mile Road is intended or provided at that corner. The sidewalks of Carlisle Street stop at the Nine Mile Road sidewalk, and do not extend to the Nine Mile Road curb. A pedestrian attempting to cross Nine Mile Road at Carlisle must, therefore, leave the sidewalk and walk across the grassy berm to reach the street. This sidewalk configuration

alone should have made plaintiff aware that there is no pedestrian crossing allowed across Nine Mile Road at Carlisle Street.

### D. Heavy Traffic/Congested Conditions

■ It is only reasonable to expect that plaintiff should have known that heavy, fast traffic and congested conditions make any crossing of multilaned Nine Mile Road, without a light at Carlisle Street, extremely hazardous. She had lived in this vicinity and been a Smiley's patron for over twenty years. Although she testified that other pedestrians occasionally cross the street at this intersection, this does not relieve plaintiff of her obligation to use the degree of care and caution which an ordinarily careful and prudent person of her own capacities would exercise under like circumstances. *Id.* at 313 Mich. 321, 21 N.W.2d 144. A crossing at this point can only be made speedily, during a break in the heavy flow of five lanes.

### E. Failure to Use Safe and Lawful Alternatives

■ Plaintiff had safe, lawful, and more convenient alternatives for crossing Nine Mile Road which for some reason she habitually ignored. She testified at trial that it was her practice after walking one block west to illegally cross Nine Mile, to then walk two blocks east on the south side to reach a pedestrian bridge to cross the I–75 expressway which also lay between her home and Smiley's. The shortest route to this bridge would have called for plaintiff to walk from Smiley's east on the north side of Nine Mile Road to its intersection with Highland, where there is both a traffic light and later a pedestrian crosswalk across the expressway. Plaintiff instead walked one block west from Smiley's to Carlisle, where she attempted to cross Nine Mile Road at an uncontrolled corner, and would then have had to double back two blocks to Highland in order to cross the pedestrian bridge over the expressway to her street. Plaintiff's route was not only unlawful and unsafe, but it was far more inconvenient than a lawful route would have been. Clearly, she had not given a

reasonable degree of thought or care to the walk she took home, weekly.

Alternatively, plaintiff could have walked two blocks west on Nine Mile to John R Street, where she could have crossed Nine Mile Road safely and lawfully with a light, and then south on John R across the expressway to her home. The John R route was also shorter than the one plaintiff chose. Plaintiff was negligent in not taking either of these safer, lawful, and more direct routes to her home.

### F. Failure to Watch Traffic Carefully

■ Plaintiff was negligent in not watching out more carefully for traffic as she attempted to cross the five traffic lanes of Nine Mile Road. She conceded in her testimony that she did not see the postal vehicle until the moment just before the accident. Police officers at the scene found no skid marks indicating excessive speed. In fact, it is uncontested that the postal vehicle was slow-moving as it eased out into the heavy flow of traffic at that intersection. Moreover, the postal vehicle approached plaintiff more from her right side than from behind her. Thus, plaintiff could have avoided the accident if she had been watching more carefully.

### G. Failure to Yield Right-of-Way

■ Finally, plaintiff failed to yield the right-of-way to the postal vehicle. Section 7.6 of the Uniform Traffic Code states,

> "Every pedestrian who crosses a roadway at any point other than within a marked crosswalk at an intersection shall yield the right-of-way to all vehicles on the roadway."

As plaintiff was not in a pedestrian crosswalk as she attempted to cross Nine Mile Road, she was under an obligation to yield the right-of-way to any oncoming vehicles. Plaintiff's failure to yield is evidence of negligence.

■ Although the government driver was unquestionably negligent, it was also negligent for plaintiff to cross Nine Mile Road unlawfully, at an unnecessarily dangerous intersection, without watching for and yielding to all vehicular traffic. It is the opinion of this Court that, although defendant's driver was responsible for 60% of the negligence which caused this accident, plaintiff was 40% comparatively negligent under the circumstances of this case.

### III. DAMAGES

■ Michigan's No-Fault Automobile Insurance Act, M.C.L.A. § 500.3135, allows damages for non-economic injuries only. All medical expenses are covered by the no-fault insurer whose claims herein have been resolved. Thus, the remaining issue before the Court is what monetary value to place upon plaintiff's pain, suffering, and mental anguish as a result of the injuries sustained.

The EMS unit transported plaintiff to Beaumont Hospital, Royal Oak, Michigan following the accident. At that time, plaintiff complained of back pain, pain in her left wrist and pain in both legs. The EMS technicians observed no external wounds, head injury, or loss of consciousness.

At the hospital, x-rays determined that plaintiff had suffered a fracture of her left wrist and a tri-malleolar fracture of her left ankle. Dr. Lane Brown, an orthopedic surgeon, treated the left wrist fracture by closed reduction and application of a long arm cast. On plaintiff's ankle fracture, Dr. Brown performed an open reduction and internal fixation with a plate on the lateral malleolus and screws in the medial malleolus. The screws and metal plate will remain in plaintiff's ankle permanently. The procedure was followed by an application of a short leg cast. No back injuries or complaints were noted, in the hospital.

Plaintiff stayed with her son and daughter-in-law for a period of five weeks following discharge from the hospital. During this time, plaintiff's mobility was severely limited. She required great personal care and attention at first, and thereafter continued to need assistance in moving around. She required a platform walker or wheel chair in order to be even minimally mobile during this time period.

Plaintiff's wrist and ankle injuries were undoubtedly extremely painful and caused

great suffering through her hospitalization and the period during which she convalesced. However, at trial the videotapes of her church wedding five weeks after the accident demonstrated that by then her most serious difficulties were largely behind her. She moved into her own home with her bridegroom, thereafter.

X-rays showed good alignment of the bones at the sites of both fractures. Plaintiff's own doctors have found the healing of her wrist and ankle to be full and normal, and it appears to the Court that her future pain and suffering will be limited to occasional discomfort, as the weight of medical evidence holds. Plaintiff's testimony to the contrary was discredited by the videotape made by postal service investigators of her activities at her home while under surveillance. Her ability, energy, and sense of well-being indeed appear to be exceptional for a woman of her age.

During an office visit in September, 1988, Dr. Lane Brown diagnosed carpal tunnel syndrome in both of plaintiff's wrists. Although the doctor found the carpal tunnel syndrome in the left wrist to be mild to moderate in nature, he performed a left carpal tunnel release to remedy the condition. The procedure was completely successful.

Plaintiff's final regular outpatient appointment with Dr. Brown for her left wrist and ankle was ten months after the accident. The doctor found that plaintiff had undergone a normal recovery period for her injuries and that the bones had aligned appropriately with satisfactory unions. A full recovery from such fractures typically requires between six to twelve months, according to Dr. Brown. Plaintiff recovered within that period.

Dr. Brown has stated that plaintiff might have minor future problems or discomfort in walking for as long as an hour at once, or lifting heavy objects with her now-healed wrist. However, these are the greatest problems that plaintiff might face, and as such, she has no restrictions on the use of her wrist. Follow-up x-rays of the fractures failed to indicate signs of traumatic arthritis.

Similarly, plaintiff has good usage of her left ankle and is only restricted from activities that would involve hours of standing or walking. The surveillance videotapes indicate a healthy gait, with no sign of the limp which was apparent in court.

As to plaintiff's low back pains, Dr. Emil Sitto treated her on numerous occasions for that complaint prior to the accident. Dr. Sitto, a specialist in internal medicine, had diagnosed a degenerative arthritic condition of the spine as early as August 8, 1985. Following further complaints of low back pain on August 22, 1985, Dr. Sitto noted tenderness over the lower spine and muscle spasm. He treated plaintiff with an injection of cortisone. On numerous subsequent visits to Dr. Sitto, plaintiff was treated with cortisone injections for back pain.

Plaintiff did not complain of any back pain to Dr. Sitto between the time of the accident (June 11, 1988) and November 16, 1988. She complained only of pain in her left arm and ankle secondary to her fractures.

Since November 16, 1988, however, plaintiff has periodically complained of lower back pains to Dr. Sitto, who has treated her arthritic condition primarily with cortisone injections. No other doctor has ever diagnosed plaintiff as having suffered a back sprain on the day of the accident. Dr. Sitto is the only doctor to corroborate plaintiff's present low back complaints or to relate such complaints to the accident, and his belated claims on her behalf are incredible in view of the objective medical evidence and other facts of record.

An independent medical examination of plaintiff was performed by Dr. Richard Krugel, a board certified orthopedic surgeon, on July 11, 1990. Dr. Krugel's examination revealed well-healed fractures of the left wrist and left ankle. He found that the bones were well-aligned and that plaintiff had undergone a normal and satisfactory recovery. Dr. Krugel diagnosed plaintiff as suffering degenerative arthritis of the lower spine. However, based on his examination of plaintiff, the x-rays of her back, and a review of her medical records,

Dr. Krugel determined that the current back condition did not result from aggravation due to the motor vehicle accident. Plaintiff's back condition, to the extent it troubles her at all, is the result of her preexisting degenerative condition.

As noted above, on August 14, 1990, Postal Inspectors Jill Burgeson and Jerry Rosenthal conducted a surveillance of plaintiff's front porch and front yard. They observed plaintiff involved in various house and garden work involving the extensive use and movement of her left hand, left ankle and back. At no time during their observations of plaintiff did she appear to have less than normal and full function of her left wrist, left ankle, or back.

On August 29, 1990, the Postal Inspectors returned to conduct a videotape surveillance of the front of plaintiff's premises. Plaintiff engaged in several activities such as standing, pacing, and waiting on her porch for long periods of time without favoring either side, bending over and pulling weeds with her left hand, carrying a food tray and a large plastic garbage bag with her left hand and walking with a normal gait. Although two men were present who could have assisted her, plaintiff moved swiftly in carrying two loads from the interior of her house to a waiting van, and then departing in the van. While she waited for the van she paced, swung and clapped her hands, and tidied the porch and yard.

The Postal Inspectors made their final observations of plaintiff on August 30, 1990 when they again conducted a videotape surveillance at plaintiff's residence. At this time they observed her moving an object on the front porch with her left foot, walking to a neighbor's house to stand and talk at length, bending down to pick up litter, drinking coffee from a mug held in her left hand (despite her testimony that the hand was too weak to hold a cup of coffee), moving a lawn chair across the porch with her left hand, and snapping beans for approximately forty-five (45) minutes from a bag to a bowl, both of which were on the floor in front of her. Plaintiff at all times showed good dexterity and endurance, a flexible spine, and full use of both hands.

Although plaintiff testified that she can only wear arch support shoes or "Reeboks", even at home, the videotapes show her working in slippers or playshoes, consistently, as she did her house and garden chores. She was never observed to limp while walking or to favor one side while standing, talking, and gesticulating at length. In fact, plaintiff never appeared to have less than normal and full function of her left wrist, left ankle or back, nor did she display any signs of being in pain. The videotapes reflect remarkable flexibility and fluidity of movement for a woman of plaintiff's age, and therefore, discredit her testimony as to the present condition of her wrist, ankle and back.

Because of the government's undisputed negligence, the intensity of her earlier suffering, and the mild residuals which physicians agree plaintiff will suffer, this Court finds that plaintiff's total damages resulting from this accident are in the amount of $100,000.00. However, as the Court has found plaintiff 40% contributorily negligent, her recovery to $60,000.00 or 60% of the total damages sustained.

ACCORDINGLY, IT IS ORDERED AND ADJUDGED that plaintiff Opal Hicks Yeary shall recover the sum of $60,000.00 from the defendant United States of America for non-economic injuries sustained as a result of defendant's negligence.

IT IS SO ORDERED.